OPINION
Nathaniel Lindsey is appealing from his conviction and sentence on one count of drug abuse following his no contest plea. His plea followed the overruling of a motion to suppress evidence which he had filed and, after a hearing, was denied by the court. The following sole error is assigned on this appeal:
 THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE RECOVERED AS A RESULT OF THE POLICE OFFICER'S UNCONSTITUTIONAL SEARCH OF DEFENDANT'S PERSON.
The "search" stated in the assignment of error refers to a "pat down" of Lindsey by the arresting officer. Lindsey had been identified as entering and leaving, after a minute or a minute and a half (Tr. 8), a known heroin house which was under police surveillance. A description of the car Lindsey was driving was radioed to the officers who ultimately made the arrest. The officers then proceeded to follow Lindsey's car and observed a traffic violation, upon which a stop was effected. There is no argument about the legitimacy of the traffic stop. The following is the testimony of Det. Stephen Bergman describing the stop and pat down at the suppression hearing:
Q. Okay. Uh. . .so then what did you do?
 A. Uh. . .we, uh. . .activated our lights. The, uh. . .vehicle pulled onto Second Street, right off of McGee and stopped. I approached — I was driving the cruiser — I approached the, uh. . ., uh. . .driver of the vehicle, which was later identified as the Defendant.
 Uh. . .I asked for an Ohio Driver's License, told why he was being stopped. And he produced a license. I asked him to step from the vehicle and walk over to the curb with me. Uh. . . he — he did. He walked over to the curb.
 Uh. . .I told him I would like to do a pat down for weapons for the safety of everybody involved. Uh. . .I went ahead and did a pat down. And in the left pocket, I could feel, uh. . .which, my experience, was gel caps. I knew we were dealing with a heroin house and when I felt the object in the pocket, it felt like gel caps.
 In fact, I said: "What do you have in your pocket?" And, uh. . .he admitted that he had heroin. And at time, I went inside and removed the gel caps from his pocket.
 Q. Okay. Uh. . .let's go back over that just a little bit more carefully. When you said, uh. . . — — I believe, you said you asked him if you could pat him down for the safety of everybody involved. Could you articulate a little bit more specifically, what exactly your concerns were? As far as your safety.
 A. Well, knowing that he just came from a drug house, uh. . .I wanted to be sure that when I am talking to him, uh. . .that we're not in danger — I'm not in danger, Sergeant's not in danger, and that there's no problems.
Q. In danger from what?
 A. Uh. . .any type of weapon. Whether it be guns, knives, needles, uh. . .anything he might have on his person that could harm us.
 Q. In your experience, have you ever stopped individuals who had just ex — exited a drug house before?
A. Yes.
 Q. And have you ever found any of those individuals to have been, uh. . . — have needles or weapons on their possession?
A. Yes.
Q. About how many times?
A. Uh. . .probably up near fifty or so.
 Q. Okay. So you were concerned that he might have a needle or a weapon basically? And you wanted to pat him down to make sure of that?
A. That's correct.
Tr. 11 — 13.
The only issue raised in this appeal is the constitutionality of the pat down search. In addition to Det. Bergman's testimony about his safety concerns, the only other witness at the suppression hearing was Sgt. Glen L. Miller, who supported Det. Bergman's safety concerns, as follows:
 Q. Okay. Sergeant, uh. . .I only have one more question for you. With respect to stops and subsequent arrests of individuals seen exiting known drug houses, is there a concern typically in your experience with those individuals possessing weapons and or needles?
A. Yes, very much. There's a lot. . .
Q. Could you. . .
A. . . .of concern.
Q. . . .explain that, please?
 A. Well, a lot of the drug people carry weapons and especially if they're going into a drug house to make a drug buy or they're in that area. They do it for their own protection, or whatever. They're — you know, it's just a volatile situation.
Tr. 23 — 24.
There was no cross-examination of Sgt. Miller, and the defendant did not testify.
The hearing was conducted by a visiting judge and in her entry denying the motion to suppress, the Hon. Judge Gorman simply referred to "the reasoning identified by the Court on the record of the hearing. . ." Docket 10. The visiting judge articulated his reasons for denial of the motion from the bench at the end of the hearing, as follows:
 JUDGE EYSTER: Given the area that the officer was working in, the fact that he had information that this particular Defendant had exited what was believed to be a drug house, the type of duty that the officer is on, and the experience from former stops, I think that the officer was justified in — in safety pat down for weapons in this particular instance.
 And I am going to deny the Motion to Suppress the results of that search.
Tr. 29 — 30.
We find the safety concerns identified by both the officers and cited by the trial court to be a legitimate reason for a pat down search in the circumstances of this case, and we will, therefore, affirm the judgment of the trial court.
In 1993, the Supreme Court of Ohio recognized that persons who are suspected of engaging in drug trafficking often are armed. "The right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed. See State v. Williams (1990),51 Ohio St.3d 58, 554 N.E.2d 108. See, also, United States v.Ceballos (E.D.N.Y. 1989), 719 F. Supp. 119, 126: `The nature of narcotics trafficking today reasonably warrants the conclusion that a suspected dealer may be armed and dangerous.'" State v.Evans (1993), 67 Ohio St.3d 405, 413.
It is common knowledge that the trafficking in drugs by the inhabitants of the underworld drug culture has grown exponentially. Accordingly, safety concerns by law enforcement officials have also grown. We cannot ignore the obvious peril facing our officers who are on the front line in the war against drugs. Even though we know that not all drug traffickers, be they sellers or buyers and users, are armed and dangerous; yet, we also know that a significant percentage of them are, and the slight inconvenience of a pat down is a small price to pay for attempting to insure the safety of the officers in the field.
We recognize that the prohibitions of the Fourth Amendment against unreasonable search and seizures have been somewhat eroded over time as the dangerous war against the drug culture has escalated, but we believe the line has legitimately shifted in favor of substantially unobtrusive pat downs because of the growing and known dangers facing officers in the field who are attempting to enforce our drug laws. In a case very similar to this one, this court just recently held a pat down justified because there was a reasonable suspicion on the part of the officers that the defendant was engaged in drug trafficking.State v. Israel (June 16, 2000), Montgomery App. No. 18066, unreported.
We find no error by the trial court in not suppressing the evidence in this case. The assignment of error is overruled, and the judgment is affirmed.
WOLFF, J. and FAIN, J., concur.